## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DANIEL SUDNICK ,            \*

                     \*

     Plaintiff         \*

     v.                  \*     Civil Action No. 06-00654 (ESH)

                     \*

DEPARTMENT OF DEFENSE   \*     **AMENDED COMPLAINT**

The Pentagon              \*

Washington, D.C.         \*     **DEMAND FOR JURY TRIAL**

                     \*

        and           \*

                     \*

JOHN A. SHAW,            \*

In His Individual Capacity,      \*

                     \*

     Defendants        \*

                     \*

\*    \*    \*    \*    \*    \*    \*

## AMENDED COMPLAINT

Plaintiff Daniel Sudnick hereby files this Amended Complaint stating new claims against Defendant John A. Shaw, in his individual capacity, pursuant to Court order dated 7 September 2006. (Such order granted Plaintiff Sudnick up to and through 7 October 2006 to file his amended complaint.)

Plaintiff brings this action for injunctive, declaratory and monetary relief pursuant to the United States Constitution, 42 U.S.C. 1985(3), the Privacy Act of 1974, 5 U.S.C. § 552a *et seq.*, the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, and state law tort causes of action.

### Jurisdiction

1. This case arises under the United States Constitution and the laws of the United States and presents a federal question within this Court's jurisdiction under Article III of the Constitution, 42 U.S.C. 1985(3), 28 U.S.C. §§ 1331 and 1343(a)(3) and 5 U.S.C. §§ 552a(g)(1). The Court has jurisdiction over the state law action against Defendant John

A. ("Jack") Shaw pursuant to 28 U.S.C. §1367.  Plaintiff seeks actual damage as well as fees and costs against the Department of Defense (DoD) for the intentional and willful violation of the Privacy Act, 5 U.S.C. § 552a(g).  The Court has authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*. The Court has authority to grant injunctive relief under the federal courts' inherent equitable powers.  Plaintiff also seeks declaratory and injunctive relief and monetary damages against Defendant John A. Shaw, in his individual capacity, as a federal employee acting under color of legal authority, under *Bivens v. Six Unknown  Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

### Venue

2.   Venue is appropriate in this District under 5 U.S.C. §§ 552a(g)(5) and 28 U.S.C. § 1391.

### Parties

3.   Plaintiff is a citizen of the United States and the State of Maryland and resides in the State of Maryland.

4.   Defendant United States Department of Defense (DoD) is an agency within the meaning of 5 U.S.C. § 552a(a)(1), and in possession and/or control of records pertaining to Daniel Sudnick.

5.   Defendant John A. Shaw is a former Deputy Undersecretary of Defense and DoD Deputy Inspector General.  Shaw resides in the State of Maryland.

### Facts

6.   Commencing in July 2003, the Coalition Provisional Authority (CPA), as the occupation government of Iraq, announced and conducted a competition to award three licenses for the commercial operation of cellular (mobile) telephone networks in Iraq.  By terms of the publicly-announced CPA tender (which was developed by the office of the CPA Senior Advisor to the Iraq Ministry of Transportation and Communications in support of the CPA Head of Contracting Activity), each interested party was required to

submit a comprehensive proposal (bid) that included technical solutions, management composition, financial information, and a history of past performance of building and operating similar scale mobile phone networks, to evidence that a bidding party possessed demonstrated capability to perform.  The tender instructed bidders that a source selection evaluation board appointed by the CPA (the "Evaluation Committee") would evaluate the bids and award three licenses – one for the north, one for the center and one for the south regions of Iraq – to the responsible bidder(s) whose proposal(s) were determined to be the overall best value.

7.   In or around July 2003, Plaintiff was appointed by the Department of Defense to a limited term Senior Executive Service (SES) position as Senior Advisor to the Ministry of Communications, Coalition Provisional Authority ("CPA"), Baghdad, Iraq.

8.   Between August and December 2003, as such Senior Advisor, Plaintiff was appointed to and served on the Evaluation Committee.  Plaintiff's responsibilities included preparing a confidential report to the Source Selection Authority (the then-CPA Administrator L. Paul Bremer) containing the Evaluation Committee's analysis and recommendations for awards.

9.   Plaintiff fulfilled these responsibilities strictly in accordance with his obligations under all applicable laws and regulations.  Most particularly, Plaintiff Daniel Sudnick strictly obeyed acquisition regulations, the U.S. Foreign Corrupt Practices Act, the U.S. bribery and gratuities statutes and regulations, as well as the U.S. criminal and civil conspiracy laws, each of which prohibited Plaintiff from soliciting and/or accepting, directly or indirectly, anything of value, in consideration of a past, present or future official act, or even otherwise taking an act that would give the appearance of impropriety.

10. During the source evaluation process, the Evaluation Committee recommended, and Source Selection Authority CPA Administrator Bremer subsequently approved, award of the mobile phone licenses to three different private sector consortia, each of

which had proposed the use of the Global Standard for Mobile (GSM) cell phone technology.

11. One of the disappointed bidders, Liberty Mobile ( a team of companies that involved friends and acquaintances of Shaw from the private sector and with whom Shaw was communicating regularly during and after the Iraq mobile telephone license competition), had proposed Code Division Multiple Access (CDMA) mobile phone technology.

12. By using his official DoD position, Shaw learned – before any mobile phone licenses actually were awarded – of the Evaluation Committee's recommendations and the Source Selection Authority's award determinations, including, but not limited to, the identities of the three designated awardees and the fact that Liberty Mobile had not been selected for any award.

13. From his official office within the Office of the Secretary of Defense (OSD), using his concurrent official position as a Deputy DoD Inspector General, Shaw then commenced an illegal scheme aimed at improperly discrediting the Source Selection decision and outcome through the release to media of DoD Inspector General/OSD raw or incomplete preliminary investigative information and other investigative materials collected by Shaw.  As part of the illegal scheme, Shaw knowingly created and released to the U.S. and international print and broadcast media organizations (on information and belief, after receiving media organizations' promises to Shaw that he would not be identified as the source) inaccurate, misleading and false reports that defamatorily intentionally stated that various CPA officials involved in the mobile phone source selection process had asked for and/or had received bribes, all in violation of DoD information program privacy practices, DoD regulations and applicable privacy laws, all as further alleged in the paragraphs below.

14. If Shaw's scheme was successful in discrediting the Iraq mobile phone source selection of bidders other than Liberty Mobile, the Liberty Mobile consortium would

-4-

have benefited from disqualification of the designated awardees and the re-opening (and, thus, re-inclusion of once-loser Liberty Mobile) in the Iraq mobile phone licensing source selection process.

15. Commencing on or about 13 October 2003 and continuing through approximately 21 November 2003, then-Deputy Under Secretary of Defense John ("Jack") Shaw (who at times relevant to the allegations of this Complaint also was a DoD Deputy Inspector General pursuant to an appointment made by the then-DoD Inspector General) (hereinafter "Shaw"), violated DoD privacy regulations and practices by releasing protected DoD confidential information to a Washington, D.C. reporter for the *Financial Times of London* containing false and defamatory allegations that two British officials at the CPA who were participating in the evaluation of the mobile phone bids had been paid bribes by Nadmi Auchi, a British businessman who has been accused by Shaw of links to the Saddam regime. These false allegations subsequently were published by the *Financial Times of London*. The identity of Shaw as the source of this illegal activity was not known to Plaintiff until sometime after 12 April 2004.

16. Commencing on or about late November 2003 (after Shaw had used his official position to learn that the Liberty Mobile consortium would not receive an award from CPA of any of the three Iraq mobile phone licenses) and continuing through April 2004, Shaw commenced a course of improper conduct directed at Plaintiff Daniel Sudnick intended to interfere with proper CPA procurement actions and decisions being handled by the CPA Head of Contracting Activity, CPA Project Management Office (PMO) and with the technical and policy support provided by the Office of Senior Advisor to the Iraq Ministry of Communications, most particularly attempting to direct the improper expansion of the scope of a First Responder Network (FRN) telecommunications systems procurement to create a business vehicle by which private sector friends and acquaintances of Shaw then would possess the right to create, build and operate an unauthorized Iraq-wide fourth cell phone network utilizing CDMA technology, for

private commercial gain of those acquaintances and friends.  Among other things, Shaw, from his official Pentagon office, communicated to Plaintiff Daniel Sudnick as follows:

A.    On 14 November, 2003, Shaw e-mailed Plaintiff Sudnick stating:  "Have not had play back from [Acting Assistant Secretary of Defense for Networks and Integration (NII)] Lin[ton] [Wells] on WH meeting, but corruption scandal is growing and we should carefully strategize on using it to ensure your (and our) success.  Am getting names of first class telecom Iraqis that are outside the political mix that could be a substantive deputy for Sami [Sheikh Sami al-Majoun who Shaw pushed to be appointed as Minister of Communications and who was a member of the Liberty Mobile board] (and you). The object is to position you to get the job done and have a viable system in place in the fastest possible time even if the award system is thrown out and the minister sacked. After talking with Lin and Ron Jost  a CDMA system tying Tier I to the rest under the rubric of providing First Responder Emergency services, but allowing you to graft onto the system all the state of the art telecom capabilities that the grouping you mentioned could develop, would seem the best answer to getting a system into place soonest. The CDMA system could then morph into a commercial service with our having total control over it. Such a system could be grafted onto the Administrative Epicenter idea and funded on a fast track capability to be operational before the cellular bidding mess works itself out. And would put you in the catbird seat. Be sure that all records pertaining to the cellular competition are secured and kept out of the hands of the Iraqis and others who are under suspicion. As it was all handled electronically I would suggest that you transfer the entire working file(s) to me for immediate transmission to IG's office. Make sure that original submissions as well as the versions removing their identification are submitted. Also records of everyone who had access to files and dates.  This is important to assure that you do not become part of the problem. Keep in mind that the investigation will give you more latitude than you now have to deny Haider access and authority over anything bearing on the telecom awards. This may be the lever to give Bremer the ability to

rearrange the ministerial bench to assure honesty and merit in the important

appointments.  All best, JACK".

B.  On 26 November 2003, Shaw e-mailed Plaintiff Sudnick stating:  "Dan-FYI I am

preparing a memorandum for Lin/Bremer on the severity of the corruption/minister

problem. My recommendation, wearing my IG hat, will be that the minister be relieved of

all responsibilities pending the completion of the investigation and that we insist on the

appointment of a neutral figure of ministerial rank whose honesty is recognized. This

should send a message that we will not put up with inbred political attempts to control

essential services (Ditto Oil, Agriculture, Finance).  Keep in mind that you cannot allow

yourself to be set up for failure. If Bremer wants to roll over for these people, tell him

you'll be leaving right after your press conference.  Your only protection from the coming

shit story is being the honest professional who will not compromise ethically or

professionally in completing your mission.  Don't apologize for that. You'll piss a few

people off, but you will ensure that you will survive.  If there is an attempt to minimize

the IG investigation in Baghdad, I will disabuse them of pursuing that line of thought.  . .

. We can either take the initiative and use the situation as a catalyst for political control in

an essential area, or follow the State Department formula for preemptive capitulation. If

you don't make a stand on this you will set yourself up to become the scapegoat when the

situation heats up. Will talk to you on the conference call tomorrow, assuming you are

back. All best, JACK"

C.  On 29 November 2003, Shaw e-mailed Plaintiff Sudnick stating:  "Lin [Wells] et

al had Tuesday meeting with Sen. Burns who is strongly supportive of creating for First

Responder/911 a CDMA system country wide that have parallel military/interior system

imposed on it along the lines we discussed. Believe we could concoct new confirguration

of Liberty CDMA bid with emergency system grafted on top of it. You could cut and add

at will, but we would have an essentially American contractor which is already to move

and which we could bring aboard with little or no fee to build out a system, and then

apply the $95 million of money from Interior to embed everything else we need. (That move would probably assure an additional 3-5000 Korean troops to provide security). Leave it to you to figure how to make it work, but such a move could be tied into the funding for the Administrative City Centers that has already been worked into the supplemental (along with communications funding) on a sole source priority basis. I have had several conversations with knowledgeable people with experience in this particular area in the building (one ex-CIA with 17 years doing exactly this) and with you whipping on the horses I think we ought to get this in place in two to three months. (And we will get credit earlier as it begins to go into place). Will follow up separately on the other problems. Thanks. All best, JACK".

D.  On 22 January 2004, Shaw e-mailed Plaintiff Sudnick, providing a copy of the e-mail to one of the principals of Liberty Mobile and also of a second entity, Guardian Mobile, formed with substantially the ownership/principals as Liberty Mobile, stating: "I think everyone is in agreement on the importance of the frequency allocations, and I know Dan is on top of the issue. Let him cut the path thru the forest. Re the additions to the overall system let the team in Baghdad add whatever bells and whistles they want. The mobile vehicles are already en route to theater and will be an important part of an instant on the ground capability and perception. . . . I am not concerned that it be 100% integrated, only that it be 100% acceptable to Dan in providing nationwide First Responder coverage on an expandable CDMA core, and that it be perceived as sequentially moving into place at warp speed. The best is the enemy of the good, and Dan is the Integrator-in-Chief. If this system includes everything that should be included in it-including Guardian's needs---it will genuinely be the ideal system. Thanks."  The Shaw's e-mail to Plaintiff Sudnick also forwarded the following correspondence from representatives of the Guardian Mobile entity:

    Hi Jack

We received this earlier.  Clearly, these guys are trying to push us awayfrom the 800MHz band.  [**NAME REDACTED – CPA official**] also called Qualcomm on this topic earlier.  The 800MHz band is where the best, most readily available equipment exists.  During the earlier cell phone competition, it was stated that this band would be available for CDMA.  We will not be able to build a commercial network unless we get the 20MHz of spectrum we asked for in the 800MHz band.  I am concerned that they will try to use this approach to push CDMA out of the picture.

The use of WiFis for moving vehicles is sheer lunacy and will not work.

CDMA2000 EVDO is the optimal solution here.

I will call you later to discuss
Regards
[Name Redacted]

-----Original Message-----
**From:** [name redacted – representative of Guardian Mobile]
**Sent:** 22 January 2004 15:42
**To:** [name redacted – representative of Guardian Mobile]
**Subject:** FW: technology questions

fyi just in

-----Original Message-----
**From:** [Name redacted –CPA official]
**Sent:** 22 January 2004 15:16
**To:** [name redacted – representative of Guardian Mobile]
**Cc:** [name redacted –U.S. Government official]
**Subject:** technology questions

Dear [name redacted – CPA official],

I am conducting a preliminary investigation into possible technologies that could be used in the First Responder Network, and the associated spectrum requirements.

I have several questions that you and your team may be able to answer.

In Region 1, the 3G technologies use the paired bands of 1920-1980 MHz and 2110-2170 MHz. Is the 3G type of technology suitable for a public safety first responder network???

I am also researching the possible application of wide area Wi-Fi technology to bring high speed data to mobile units such as in automobiles.  I recently read a product announcement by Wi-LAN Inc. on their model LIBRA 5800 that they claim can achieve a data rate of 22 Mbps.  Are you familiar with this type of technology, and would you recommend it for a first responder network.

I would appreciate your assistance with these matters.

Thank you, and best wishes.

[Name redacted – CPA official]
Commercial (1) 781-280-5808/5809

   E.  On 3 March 2004, Shaw e-mailed Plaintiff Sudnick, stating:  "Dan---The continuing contracting minuet has obscured what must be part of the NANA [an Alaska Native Corporation that had met with Shaw and had been encouraged by Shaw to "team" with Guardian Mobile and then present a sole-source bid under Section 8(a) of the Small Business Act for a CDMA network, an attempt later rejected by CPA Administrator Bremer]/Guardian rollout:  (1)That while this contract is only the first step it is intended to prove the workability of an interoperable CDMA/GSM system using a CDMA spine for the entire first responder system;(2) That this first step is the foundation for the build out of a truly national FRN using CDMA; and (3)That NANA, by getting this first contract is assured by law of being the vehicle for all the add-on contracts necessary to build out the national system. The final step of allowing for the other change we discussed after the completion of the national FRN over the next couple of years should probably be codified in the original contract as well, but might be added in some follow-up document before the handover on June 30. The urgency of the need here-especially the area beyond the Green Zone-should shelve any need to start this slowly. Given, moreover, the way that the cellular license competition was cooked both re technology and recipients (and that investigation is continuing regarding American involvement) there can be no question that this effort is to establish through competition the superiority of this US technology. These contracts, as you pointed out, are only a tiny part of the

overall FRN, and can be facilitated by Bechtel or any one of the other on the ground contractors, but the national rollout has to be driven by CDMA and NANA's overarching contracting primacy.  The transparency of this effort should be in contrast to the corruption, manipulation, and opacity of the "competition" last year. This is especially true as I gather the southern region winner is going through internal upheaval as the component Iraqi fixers try to cover their investments (and their tails) and will no doubt be anxious to kill any potential CDMA entry into any part of the telecom picture.  Now that we have finally educated the PMO and contracting wallahs we have to ensure that NANA implements its intended mission with the priority and organization primacy it was supposed to have.  That effort ought to be something you can report to the NSC when you return here several weeks from now. Let's roll on this. All best, JACK".

F.   On or about 9 March 2005, Shaw, having received a CPA RFP generated by the Head of Contracting Activity with technical and policy input provided by the Office of the Senior Advisor to the Ministry of Communications under Plaintiff Sudnick's supervision which accurately stated the requirements of the First Responder Network, and, accordingly, did not provide for any commercial cellular service whatsoever (either locally or Iraq-wide), communicated with NANA (but not with the CPA) that NANA should include in NANA's contract documents language that Shaw had written (without NANA bringing such language to the attention of the Office of Senior Advisor to the Ministry of Communications or the CPA contracting authorities), as follows:

"The FRN shall be designed so that the operators of the network [NANA/Guardian] shall be able to offer nationwide commercial cellular service on a nationwide basis throughout Iraq."

G.   This attempt by NANA/Guardian Mobile was rejected by Plaintiff Sudnick as being improper.  CPA Administrator J. Paul Bremer, having been advised of Shaw's conduct and these developments, determined that no sole-source contract for FRN should be awarded to NANA/Guardian, and directed CPA contracting officials to reject the

NANA/Guardian proposal as not conforming to the CPA Request for Proposal (RFP) and
to cancel the RFP. CPA Contracting officials did so.

    H.  On 12 March 2004, Shaw e-mailed Plaintiff Sudnick, stating:  "Dan---I think you
got from all quarters this morning the sense of dissatisfaction with your structuring of the
FRN effort. You could not, however, read the response to the inadequacy of your
response. What you reported was not substantively an advance on what you reported here
two weeks ago, and on specific questions you were evasive or non-responsive. You
effectively confirmed the lack of adequate coordination that concerned everyone here.
Until and unless there is agreement that you have been responsive to the expressed needs
from every quarter for the FRN, no plan of yours will go forward to be funded.  So that
there is no misunderstanding, your proposal for a GSM vs. CDMA pilot is a non-starter.
The spine of the FRN will be the interactive GSM/CDMA you have ostensibly worked to
fast track as required by law, and which now lies completed and ready for signature in
Contracting.  There are rumors of a March 16 RFP for FRN, but if that is what you
proposed I can tell you that will be DOA.  Ditto any move to have the entire effort
absorbed by Bechtel under its expanded contract. The whole point of the ANC [Alaska
Native Corporation] 8a process [involving only the NANA/Guardian Mobile entity] was
to accelerate project implementation without affecting quality or price. Contracting
confirmed last week that inexperienced lawyers in Baghdad created a delay of nearly two
months in the ANC 8a initiatives, and that any qualified ANC 8a will have their
automatic priority rights as the prime contractor in both the FRN build out and in the
Umm Qasr port development effort. In addition, the CPA contracting support group
located here at the Pentagon is ready, willing, and able to provide immediate turn around
capabilities to successfully complete the tasking.  Any additional Bechtel effort will have
to be built on this foundation, as Senator Stevens will confirm when he arrives in
Baghdad.  His office is not pleased with the way you have tried to manipulate the process
to promote your own projects (and threaten the Eskimos) instead of moving aggressively

-12-

on the port and FRN buildout as originally planned. Your report on the licensed cellular system buildout was disingenuous: You omitted or downplayed serious problems with the Atheer third of the system, and that display of partial truth connected with your pressure to hire for FRN oversight a number of people drawn from the winning circles of that corrupted process, raises questions of whether you have a personal agenda in play here. We are equally appalled re the lack of movement on the Haider front. You were told of the exquisite timing of the Tokyo trip and the imperative of not staffing the agreed upon solution around town. It was an initiative that would be arranged by Iraqis for Iraqis, and I hope you have not slow rolled and killed the opportunity for change in that arena as well. Finally, I asked you again this morning at the request of the Deputy Secretary for signed copies of the three license contracts [the originals of which were maintained by the CPA Office of General Counsel for safekeeping] (just as the system was going down in Baghdad). I was told while the service was being restored that you had ignored multiple requests for them. I responded that I knew there had been a sequence of delays and attempts to change the terms of the contracts, but that I believed that the process had been completed by the first of the year. Is there some reason why they are not forthcoming? Given the results of the tender it is reasonable that someone here reviews the dimensions of each of those contacts. From your demeanor this morning it looked as though you are trying to use Jerry Bremer as a shield to avoid facing the above shortcomings. You have served him responsively and well to address some of his pressing needs, but you selectively informed him of problems in much the same way you have dealt with your support here. What is important here is completing the job in the most expedited way. You can either help or hinder that effort. Make the right choice. JACK".

I.    On 9 March 2004, Shaw again e-mailed Plaintiff Sudnick, stating: "Dan-This is a heads up. The "specific technology focus" is not the CDMA element. Try and get the NANA omnibus contract and the properly scoped FRN spine contract out ASAP, as well

-13-

as whatever other initiates are coming from you. We have wasted two months playing games with contracting. Am meeting with [PMO Director Admiral (Ret.)] Nash [in DC] this AM. JAS".

    J.  On 9 March 2004, Shaw again e-mailed Plaintiff Sudnick, stating: "Dan-You should be aware that Bremer freeze on contracts today was result of Reuben Jeffrey's call to him this AM. Believe that there is considerable frustration from military side re lack of coordination/responsiveness and adequate implementation of surveillance and security concerns in FRN planning and revision. Yr calculated diminution of the scope of work for NANA/Guardian rightly raised the concerns of the Qualcom folks, who correctly believed that they were building out the spine of the national FRN, one which could absorb any and all security taskings imposed on it. Everyone has understood for months that the fast path to that buildout was NANA and the proven dual GSM/CDMA capability that Guardian represents. Your changes to the scope of work for Guardian together with your sub rosa attempt to force the hiring of a group of individuals heavily involved in the tainted cellular license awards looks very much like an attempt to preempt the FRN in much the same way that the earlier effort was compromised. It is important for the integrity of the process that the joint GSM/CDMA effort be given a fair hearing, particularly as it is the superior technology developed in the US. If you are incapable of playing an honest broker in that respect, you should step aside and allow the C6 people to develop the NANA initiative that should have been in place 4 months ago. . . . It's time for some professionalism instead of empire building. JAS".

    K.  On 10 March 2004, Shaw e-mailed Plaintiff Sudnick in an attempt to forestall legitimate planned developments in the FRN program that would have precluded the improper manipulations that Shaw had set in motion so as to benefit the private interests of his Liberty Mobile/Guardian/NANA friends and acquaintances: "Dan-We are concerned that there is an ongoing attempt to insert Nokia and Cisco in the FRN development in ways are intended to remedy major shortcomings of Atheer in their

-14-

cellular contract in the South. Given the gamut of unanswered questions regarding the cellular licenses it seems extremely unwise to bring them anywhere near to FRN rollout. Equally important, now that all of the NANA contracts have been through the contracting approval process any attempt to push them aside for a Bechtel sole source would roll out even further the FRN timeline. We are unable to reconcile your ostensible ongoing support to expedite the NANA solution, which is mandated by law [a misstatement of law] with the slow roll and back room manipulations that their contracts have been subjected to over the past month or so. In an unrelated matter I have been asked by a senior level figure in this department for signed copies of the cellular licenses, and would appreciate receiving copies by COB today. Thank you.  JAS".

L.  On 11 March 2004, Shaw e-mailed Plaintiff Sudnick, stating: "Dan---Your silence is deafening. You complained months ago that you would not allow yourself to "be set up for failure." In the end you have set yourself up for failure. As your principal supporter at DoD let me suggest that you step aside and become part of an immediate solution rather than a continuing part of the problem. You are close to receiving a unanimous vote of no confidence in your ability to manage. With the cellular license award in shambles the FRN is the last opportunity to install a viable cellular network that is responsive to our needs and requirements. Your continuing unresponsiveness and calculated delays in its implementation have nearly killed the projected plan, which may have been what you had in mind. But if you can't lead or follow, get the hell out of the way ….My office remains ready—along with everybody else here---to facilitate the plans for the FRN, but you have done more in the last week to undermine the FRN than you have done since August to implement it. We have time for only one last shot, and failure is unacceptable. JAS ".

17. Plaintiff Sudnick made a report of Shaw's misconduct to CPA Administrator Ambassador Bremer, the CPA General Counsel, the Special Inspector General for Iraq Reconstruction, as well as to Shaw's supervisor (in Shaw's capacity as a DoD Deputy

Inspector General), the DoD Inspector General.

18. The CPA then received demands originating from the Office of the Secretary of Defense, where Shaw held his position as Deputy Undersecretary of Defense, that Plaintiff Sudnick's resignation as CPA Senior Advisor to the Ministry be compelled. A ranking CPA official then demanded Plaintiff Sudnick's resignation under the threat that if Plaintiff Sudnick did not resign, he would be fired.

19. On 31 March 2004, Plaintiff Sudnick tendered his resignation, effective as of 13 April 2004.

20. Prior to 12 April 2004, Shaw learned that Plaintiff Sudnick and others had made allegations of misconduct against him arising from Shaw's attempts to secure for Liberty Mobile and/or Guardian Net the right to operate a mobile phone network in Iraq.

21. After learning that Plaintiff Sudnick and others had made such allegations of misconduct against him, Shaw sought both to discredit Plaintiff Sudnick and to further his scheme to have the three Iraq mobile phone licenses cancelled so that Liberty Mobile/Guardian Net then would have an opportunity to gain at least one Iraqi mobile phone license by commencing a series of illegal disclosures to various media reporters and outlets of Privacy Act-covered information pertaining to Plaintiff Sudnick that contained false and inaccurate allegations that Plaintiff Sudnick had been offered and or had received bribes during the time that Plaintiff Sudnick served as CPA Senior Advisor to the Ministry of Communications (the "Illegal DoD Sudnick Privacy Act Information Disclosures), consisting of, among other things: a Privacy Act Record pertaining to Sudnick consisting of "report of investigation" that Shaw had prepared and illegally disclosed; and statements and representations of fact by Shaw that were derived from the Privacy Act records pertaining to Sudnick.

22. In making the Illegal DoD Sudnick Privacy Act Information Disclosures, Shaw stated that he was a Deputy Undersecretary of Defense and a DoD Deputy Inspector General.

-16-

23. The Illegal DoD Sudnick Privacy Act Information Disclosures consisted of at least each of the following:

A.  On or about 12 April 2004, to a Washington, D.C. reporter for the *Financial Times of London.*  On 12 April 2004, the reporter stated to Plaintiff Sudnick that he had a copy of an official DoD report stating that Plaintiff Sudnick had accepted bribes and had been fired by the CPA.

B.  Between about 12-30 April 2004, to a reporter for the *Los Angeles Times*.  The reporter stated to Plaintiff Sudnick that he had been given a copy of an official 20+ page DoD Inspector General report stating that Plaintiff Sudnick had accepted bribes and had been fired by the CPA.

C.  On or about 28 April 2004, to *ABC News*.  A broadcast news reporter for *ABC News* stated to Plaintiff Sudnick that Shaw had provided a report to *ABC News* that had "Sudnick's name all over it", Shaw had stated that he was an DoD IG and that he (Shaw) is investigating the Iraq cell phone license awards.

D.  On or about 4 May 2004, to the *Washington Times*.  A reporter for the *Washington Times* contacted Plaintiff Sudnick and stated that he has received information from a DoD official that that Plaintiff Sudnick received bribes from Auchi, and that the *Washington Times* would run an news article repeating the statements in the Shaw "DoD IG" report.

E.  On or about 8 May 2004, to *NBC News*.  A reporter for ABC News contacted Plaintiff Sudnick and stated that he had received a copy of Shaw's report, that the report states that Plaintiff Sudnick received bribes from Auchi to corrupt the Iraq mobile phone selection process.

F.  On or about 9 June 2004, to *Newsweek* magazine.  A reporter for *Newsweek* contacted Plaintiff Sudnick and stated that he has a copy of the Shaw "DoD IG" report, and that the report states that Plaintiff Sudnick received bribes from Auchi to corrupt the Iraq mobile phone selection process.

-17-

G. On or about 14 June 2004, to the *Washington Times*. A reporter from the Washington Times contacted Plaintiff Sudnick and stated that he had received a copy of the DoD IG report and that the report states that Plaintiff Sudnick received bribes from Auchi to corrupt the Iraq mobile phone selection process.

23. Each such representation of bribes or other misconduct contained in the Illegal DoD Sudnick Privacy Act Information Disclosures is false and defamatory, and damaging to Plaintiff Sudnick.

24. As a consequence of the Illegal DoD Sudnick Privacy Act Information Disclosures, the following news reports appeared in the media, each of which falsely reported that Plaintiff Sudnick received bribes in connection with the Iraq Mobile Phone licensing process:

A. On 9 May 2004, in the *Washington Times*:

"According to the defense official, 'significant and credible evidence' reveals 'a conspiracy was organized by Auchi to offer bribes to "fix" the awarding of cellular-licensing contracts covering the three geographic areas of Iraq.'

Several American, British and Iraqi nationals are under investigation in addition to Auchi for the reputed cell-phone bid rigging, U.S. officials said.

Two American officials working within the Iraqi Communications Ministry resigned last month and accused a Pentagon official of improperly influencing another contracting process in Iraq. The matter involving all three officials is under investigation by the Pentagon's inspector general.

'The implications of [Auchi] having fixed the three tenders for the entire Iraqi cellular-telephone system go beyond mere corruption and technical empire building' the defense official said."

    B.  On 6 June 2004, in the *Washington Times*:

"The preliminary probe was prompted by a report by the Pentagon's International Armament and Technology Trade Directorate [Shaw's office] that stated that cash payments of up to $11.5 million were made to two Iraqi officials, two British contractors and two Americans as part of the fix.

Orascom [the Central Iraq cell phone licensee] was described in the Pentagon report as Auchi's 'principal corporate vehicle' and is made up of several Middle Eastern companies.  Atheer [the Southern Iraq cell phone licensee] is a Kuwaiti enterprise, and AsiaCell [the Northern Iraq cell phone licensee] is a Kuwaiti-based consortium made up of U.S., German and Chinese companies.  At least one of these Chinese companies is the same one that did business with the Saddam regime."

    C.  On 29 March 2005, in the internet news publication *Newsmax:*

"According to the Defense Department report, U.S. and U.K. officials are also involved deeply in allegations of payoffs, kickbacks and bribes.

Two key U.S. players inside Iraq were Dr. Daniel Sudnick, the Coalition Provisional Authority (CPA) senior adviser for communications, and Terry Sullivan, who acted as the go-between for the CPA and the Iraqi governing council on Telecom issues.

Sullivan, for example, left his position with the U.S. government "to join the winning bidder in the southern [Iraq] region, Atheer, two weeks before the announcement of contract winners," noted the Defense Department report.

"There remain numerous allegations of payoffs and kickbacks from the winning consortia to a variety of decision makers, including [Iraqi] Minister of Communications Haider al-Abadi, Dr. Daniel Sudnick and Iraqi Governing Council member Ibrahim al-Jafferi," states the May 2004 Defense Department report."

25. Shortly after receiving the first inquiry from the press on 12 April 2004 revealing to Plaintiff Sudnick that Shaw was violating the Privacy Act as to Plaintiff Sudnick by making the illegal disclosure to the *Financial Times* described above, Plaintiff Sudnick

reported this development to the Office of the DoD and asked the DoD IG to intervene so as to preclude further violations of the Privacy Act and any further damage to his reputation.

26. DoD took no action either to preclude Shaw's further violation of the Privacy Act with respect to Plaintiff Sudnick, or to prevent any further harm to Sudnick's reputation from the illegal, defamatory disclosures.

27. None of the Illegal DoD Sudnick Privacy Act Information Disclosures constituted a "routine use" under the Privacy Act and applicable regulations.

28. Each of the Illegal DoD Sudnick Privacy Act Information Disclosures was prohibited under the Privacy Act and implementing regulations with the force and effect of law, including, but not limited to regulations establishing DoD Information Practices applicable to DoD IG records and the records of the Office of the Secretary of Defense.

29. Plaintiff Sudnick communicated to the news organizations his objections to and denials of any truth of the representations of misconduct on his part contained in the Illegal DoD Sudnick Privacy Act Information Disclosures.

30. Plaintiff also communicated to the DoD IG his objections to and denials of any truth of the representations of misconduct on his part contained in the Illegal DoD Sudnick Privacy Act Information Disclosures.

31. At the time of the Illegal DoD Sudnick Privacy Act Information Disclosures, Plaintiff was seeking employment and otherwise pursuing financial opportunities.

32. Subsequent to, and as a direct cause of the Illegal DoD Sudnick Privacy Act Information Disclosures Plaintiff Sudnick was informed by private and public sector entities (including DoD) and persons with whom Plaintiff Sudnick was pursuing present and future financial opportunities and employment that such entities and persons had read the news reports of the unfounded allegations and no longer were interested in pursuing present or future financial opportunities with and/or employment of Plaintiff Sudnick.

33. In December 2004, the Office of the DoD IG reported that Plaintiff Sudnick was

-20-

"clean" and, thus, was "cleared" of any of the allegations.

34. Nevertheless, although plaintiff has expressed interest in being re-employed by DoD in an appropriately senior-level position, DoD still has not done so, stating that the allegations that appeared in the press were reasons why DoD could not do so.

35. To this day, such defamatory and false allegations concerning plaintiff continue to appear and are republished on the Internet, and are accessible to the world through various commonly-used search engines, including Google, Yahoo, AOL, etc., as a direct consequence of the Illegal DoD Sudnick Privacy Act Information Disclosures.

36. DoD has not made known to the public or the media the determination of the DoD IG that the allegations made against Plaintiff Sudnick by Shaw, and released by DoD and Shaw to the press, are without merit.

37. DoD failed to take any corrective or disciplinary action vis-à-vis Shaw at any time while Shaw was violating the Privacy Act.

38. On 28 October 2004, Shaw wrongfully released to *Financial Times of London* and the *Washington Times* a statement that Russian commandoes has removed high-grade explosives from Iraq in the days before the March 2003 invasion.

39. In early December 2004, DoD terminated Shaw from his position and severed all relationship of Shaw to DoD for this reason, but not because of Shaw's prior violations of the Privacy Act.

40. On information and belief, prior to and subsequent to DoD's termination of Shaw, Shaw knowingly falsely and maliciously published and republished the false representations of fact, in other than his officials capacity, that Plaintiff Daniel Sudnick: (i) had engaged in unethical and illegal conduct, including factual representations that Plaintiff Sudnick either asked for and/or received bribes; and/or (ii) was under active criminal investigation by U.S. Government criminal investigative authorities as to the allegations made by Defendant Shaw against Plaintiff Sudnick when in fact no such active criminal investigation was being conducted.

A.     Such publication includes, but is not limited to, Defendant Shaw falsely and maliciously representing to a *Washington Legal Times* reporter, on or about 15 June 2006, that Plaintiff Daniel Sudnick was under active criminal investigation by U.S. Government criminal investigative authorities for the allegations made by Shaw against Plaintiff Sudnick, when in fact such representation was not true and either was known or should have been known to Defendant Shaw to be not true.

**First Cause of Action**
**(Against Defendant DoD)**
**(Privacy Act – Improper Dissemination)**

41. Daniel Sudnick repeats and realleges the allegations contained in paragraphs 1 through 40, above, inclusive.

42. The DoD, through the actions of then-Deputy Undersecretary of Defense John Shaw and, on information and belief, Does 1 through 10, disseminated information protected by the Privacy Ac concerning Sudnick to [names of news organizations] and unknown others.  This information included, but is not limited to, inaccurate and defamatory information surrounding [synopsize].

43. In violation of section (d)(1) of the Privacy Act, the DoD failed to secure written authorization from Sudnick prior to providing the specific information detailed above. Nor was disclosure permitted by a routine exception.

44. As a result of DoD's violations of the Privacy Act, Daniel Sudnick has suffered adverse and harmful effects, including, but not limited to, mental distress, emotional trauma, embarrassment, humiliation and lost or jeopardized present or future employment and financial opportunities.

**Second Cause of Action**
**(Against Defendant DoD)**
**(Privacy Act – Improper Dissemination)**

45. Daniel Sudnick repeats and realleges the allegations contained in paragraphs 1 through 44, above, inclusive.

46. Prior to disseminating information and records concerning Daniel Sudnick, DoD failed to make reasonable efforts to ensure that the information and records were accurate, complete, timely and relevant for agency purposes in violation of 5 U.S.C. § 552a(e)(6). DoD compiled information concerning Daniel Sudnick's alleged receipt of bribes and other alleged misconduct relating to the award by the CPA of the three Iraq mobile phone licenses. The information and records that were disseminated to unauthorized individuals and news organizations were irrelevant, false, malicious and defamatory, incomplete, inaccurate, and untimely.

47. DoD, its employees and officers, including then-Deputy Undersecretary of Defense Shaw, knew or should have known that their actions were improper, unlawful and/or in violation of the Privacy Act.

48. DoD, its employees and officers, including then-Deputy Undersecretary of Defense Shaw, acted intentionally or willfully in violation of Daniel Sudnick's privacy rights.

49. As a result of DoD's violations of the Privacy Act, Daniel Sudnick has suffered adverse and harmful effects, including, but not limited to, mental distress, emotional trauma, embarrassment, humiliation, and lost of jeopardized present or future employment and financial opportunities.

## Third Cause of Action
### (Against Defendant DoD)
### (Failure to Account for Privacy Act Disclosures)

50. Daniel Sudnick repeats and realleges the allegations contained in paragraphs 1 through 49, above, inclusive.

51. DoD is required by Subsection (e) of the Privacy Act, 5 U.S.C. § 552a(e) to do at least the following prior to making any Privacy Act disclosure:

A. Subsection (e)(2): "[C]ollect information to the greatest extent practicable directly from the subject individual when the information may result in adverse determinations

about an individual's rights, benefits and privileges under Federal programs."

    C.  Subsection (e)(5):  "[M]aintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness and completeness as is reasonably necessary to assure fairness to the individual in determination."

    D.  Subsection (e)(6), Prior to the dissemination of a record "make reasonable efforts to assure that such records are accurate, complete, timely, and relevant for agency purposes."

    52. The conduct of DoD alleged in paragraphs 1-38, above, violated:

    A.    Subsection (e)(2) of the Privacy Act.  DoD did not "collect information to the greatest extent practicable directly from" Plaintiff Sudnick. The information compiled by Shaw was that which "may result in adverse determinations about [Plaintiff Sudnick's] rights, benefits and privileges under Federal programs.

    B.    Subsection (e)(5); and

    C.    Subsection (e)(6).

**Fourth Cause of Action**
**(Against Defendant Shaw In His Individual Capacity)**
**<u>(Violation of Fifth Amendment Due Process Rights)</u>**

    53. Daniel Sudnick repeats and realleges the allegations contained in paragraphs 1 through 52, above, inclusive.

    54. The Fifth Amendment to the U.S. Constitution encompasses the right of the individual to contract and to engage in any of the common occupations of life. Accordingly, where a person's good name, reputation, honor or integrity is at state because of what the government is doing to him, notice and an opportunity to be heard are essential.  To be deprived of not only present employment but of future opportunity for it is no small injury when government employment so dominates the field of

opportunity.

55. Defendant Shaw, in his individual capacity, violated Plaintiff Sudnick's Fifth Amendment right by publicly stigmatizing Plaintiff Sudnick through a campaign of making false representations and allegations against Plaintiff Sudnick within and outside of DoD, including to print and broadcast media (as alleged above), without notice or any opportunity to be heard and without any avenue for appeal. Such action by Defendant Shaw effectively deprived Plaintiff Sudnick of the liberty to work in Plaintiff Sudnick's chosen field.

56 Defendant Shaw's unlawful conduct has caused Plaintiff Sudnick to sustain continuing injury that is likely to continue (or recur) indefinitely unless and until declaratory judgment and injunctive relief is rendered in favor of Plaintiff Sudnick.

57. Plaintiff Sudnick therefore seeks declaratory and injunctive relief against Defendant Shaw in his individual capacity. Plaintiff Sudnick also seeks monetary damages against Defendant Shaw as a federal employee acting under color of legal authority, in his individual capacity, under *Bivens v. Six Unknown Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

**Fifth Cause of Action**
**(Against Defendant Shaw In His Individual Capacity)**
**(42 U.S.C. 1985(3) Conspiracy to**
**Deprive of Equal Protection of Law so as to Cause Injury to Person)**

58. Daniel Sudnick repeats and realleges the allegations contained in paragraphs 1 through 57, above, inclusive.

59. On information and belief, Defendant Shaw and unnamed Does 1- 20, within one or more of the States of the United States of America, conspired together for the purpose of depriving Plaintiff Sudnick, directly or indirectly, of the equal protection of the laws of the United States, so as to injure Plaintiff Sudnick in his person and property and deprive him of his Constitutionally-protected Liberty interest right in his good name, reputation

honor and/or integrity and his Constitutionally-protected Liberty interest in present employment and future opportunity, in violation of 42 U.S.C. 1985(3) (the "42 U.S.C. 1985(3) Conspiracy").

60. On information and belief, the objects of the 42 U.S.C. 1985(3) Conspiracy included, but were not limited to, each of the following:

    A.    To wrongfully undermine and destroy the integrity of the competition and award of the Iraq commercial cell phone licenses and communications procurement actions in which Plaintiff Sudnick was involved and to wrongfully undermine and destroy the good name, reputation, honor and integrity of Plaintiff Sudnick for the purpose of creating mobile phone and communications business opportunities in Iraq for the business associates of Defendant Shaw who had competed for but failed to obtain mobile phone licenses and mobile phone-related communications contracts administered by the CPA in Iraq.

    B.  To wrongfully undermine and destroy the good name, reputation, honor and integrity of Plaintiff Sudnick as a whistleblower and witness against Defendant Shaw and the other Doe 1-20 co-conspirators.

61. On information and belief, in furtherance of the 42 U.S.C. 1985(3) Conspiracy, one or more of the conspirators, including Defendant Shaw, caused to be done the following acts in furtherance of the object of the conspiracy that injured Plaintiff Sudnick in his person and property and deprived Plaintiff Sudnick of his Constitutionally-protected Liberty interest right in his good name, reputation honor and/or integrity and his Constitutionally-protected Liberty interest in present employment and future opportunity:

    A.    Defendant Shaw, in concert with one or more of the conspirators, produced the "report of investigation" referenced in Paragraph 22 of this Amended Complaint, above, that contained Defendant Shaw's malicious and false allegations as to Plaintiff Sudnick that Plaintiff Sudnick had broken laws by, among other things, asking

-26-

for and receiving bribes;

B.    Defendant Shaw, in concert with one or more of the conspirators, provided the "report of investigation" to print and broadcast media outlets (as alleged above) and otherwise made statements that Defendant Shaw knew or ought to have known were false and malicious, to the effect that Plaintiff Sudnick committed serious violations of law while serving as the CPA Senior Advisor to the Ministry of Communications.

C.    Defendant Shaw, in concert with one or more of the conspirators, made statements to officials within the Office of the Secretary of Defense (OSD) and other DoD offices to the effect that Plaintiff Sudnick committed serious violations of law while serving as the CPA Senior Advisor to the Ministry of Communications.

62. Defendant Shaw, violated 42 U.S.C. 1985(3) by conspiring to publicly stigmatizing Plaintiff Sudnick through a campaign of making false representations and allegations against Plaintiff Sudnick within and outside of DoD, including to print and broadcast media (as alleged above), without notice or any opportunity to be heard and without any avenue for appeal.  Such action by Defendant Shaw effectively deprived Plaintiff Sudnick of the liberty to work in Plaintiff Sudnick's chosen field.

63. Defendant Shaw's unlawful conduct has caused Plaintiff Sudnick to sustain continuing injury that is likely to continue (or recur) indefinitely unless and until declaratory judgment and injunctive relief is rendered in favor of Plaintiff Sudnick.

64. Plaintiff Sudnick therefore seeks declaratory and injunctive relief against Defendant Shaw in his individual capacity.  Plaintiff Sudnick also seeks monetary damages against Defendant Shaw under 42 U.S.C. 1985(3).

### Sixth Cause of Action
### (Against Defendant Shaw)
### (Defamation – False and Malicious Statements Made to *Legal Times* Reporter)

65. Daniel Sudnick repeats and realleges the allegations contained in paragraphs 1 through 54, above, inclusive.

66. Defendant Shaw composed and caused the false and defamatory statements pertaining to Plaintiff Sudnick set forth in Paragraph 42(A) of this complaint, above, with the intent that the false and defamatory statements pertaining to Plaintiff Sudnick be published in the print media outlets (including the Internet).

67. On information and belief, Defendant Shaw additionally verbally published and republished the false statements pertaining to Plaintiff Sudnick to U.S. Government officials and persons outside the U.S. Government within one year of the date of the filing of the Complaint in this action.

68. Each such statement was false, misleading, disparaging and defamatory about Plaintiff Sudnick.

69. In making such statements, Defendant Shaw acted with malice, had knowledge that the statement was false, and/or acted with a reckless disregard for the truth and without reasonable grounds to believe that the statement was true.

70. As a proximate result, Plaintiff Sudnick suffered substantial damages, including but not limited to loss of reputation, embarrassment and personal humiliation. WHEREFORE, Plaintiffs demands judgment against Defendant Shaw for compensatory damages, punitive damages, prejudgment interest, postjudgment interest, costs, attorney's fees and such other relief as the Court deems appropriate.

**Seventh Cause of Action**
**(Against Defendant Shaw)**
**<u>(Invasion of Privacy - False Light: Statements Made to _Legal Times_ Reporter)</u>**

71. Plaintiff Sudnick realleges paragraphs 1 through 70 as if fully set forth herein.

72. The statements made by Defendant Shaw as alleged in Paragraph 42(A), that Plaintiff Sudnick is still under active criminal investigation as to the allegations made by Shaw more than two years after Shaw first released his "report" concerning Plaintiff Sudnick to the media as alleged above and also provided his "report" to the Department of Defense Inspector General place Plaintiff Sudnick in a false light that is highly

offensive to a reasonable person (the "False Light Statements").

73. In composing the False Light Statements and giving the False Light Statements to a print news media reporter, Defendant Shaw acted with malice, had knowledge that the statement was false, and/or acted with reckless disregard for the false light in which he was placing Plaintiff Sudnick.

74. As a proximate result, Plaintiff Sudnick suffered substantial damages, including but not limited to loss of reputation, severe emotional distress, embarrassment and personal humiliation.

WHEREFORE, Plaintiff Sudnick demands judgment against Defendant Shaw for compensatory damages, punitive damages, prejudgment interest, postjudgment interest, costs, attorney's fees and such other relief as the Court deems appropriate.

*    *    *    *    *

### Prayer for Relief

RELIEF PRAYED FOR AGAINST DEFENDANT DoD:

WHEREFORE, plaintiff Daniel Sudnick requests that the Court award him the following relief against Defendant DoD:

(1) Declare that DoD violated the Privacy Act;

(2) Award Daniel Sudnick any actual damage under 5 U.S.C. § 552a(g)(4)(A), the exact amount of which is to be determined at trial but is not less than $3,000,000.00 (three million dollars);

(3) Invoke its equitable powers to expunge all records or information maintained by the DoD that is inaccurate and/or derogatory to Daniel Sudnick;

(4)Invoke its equitable powers and order the DoD Secretariat to make an official statement to all news organizations (including, but not limited to the news organizations stated above) and prominently post a statement on the DoD website that: (a) DoD violated the Privacy Act in making Illegal DoD Sudnick Privacy Act Information Disclosures; and (b) the allegations against Plaintiff Sudnick in the Illegal DoD Sudnick

-29-

Privacy Act Information Disclosures are unfounded and without merit.

(5) Award plaintiff reasonable costs and attorneys fees as provided in 5 U.S.C. § 552a(g)(3)(B) and/or (4)(B) 28 U.S.C. 2412;

(6) Refer those DoD officials responsible for violating the Privacy Act for prosecution under 5 U.S.C. § 552a(i)(1);

(7) Expedite this action in every way pursuant to 28 U.S.C. § 1657(a); and

(8) Grant such other relief as the Court may deem just and proper.

RELIEF PRAYED FOR AGAINST DEFENDANT SHAW:

WHEREFORE, plaintiff Daniel Sudnick demands trial by jury of Plaintiff Sudnick's claims against Defendant Shaw and requests that the Court award him the following relief against Defendant Shaw in his individual capacity:

(1) Issue a declaratory judgment that Defendant Shaw's conduct, in his individual capacity as described above violated Plaintiff Sudnick's constitutional rights under the Fifth Amendment;

(2) Issue a declaratory judgment that Defendant Shaw's conduct, in his individual capacity in conspiracy and concert with Does 1-20, violated 42 U.S.C. 1985(3);

(3) Issue a permanent injunction prohibiting Defendant Shaw from ever again making any of the false and malicious representations and communications contained in the Shaw-authored "report of investigation" described above;

(4) Issue a permanent injunction prohibiting Defendant Shaw from violating Plaintiff Sudnick's constitutional rights under the Fifth Amendment and from violating 42 U.S.C. 1985(3) by substantially repeating the conduct in which Defendant Shaw was engaged in as described above;

(5) Issue a permanent injunction prohibiting Defendant Shaw from ever again making any representation to anyone that Plaintiff Sudnick is under active criminal investigation of any kind;

(6) Award Plaintiff Sudnick compensatory damages in the amount of at least

$3,000,000;

(7) , Award Plaintiff Sudnick punitive damages in an amount not less than $10,000,000;

(8) Award Plaintiff Sudnick prejudgment interest, postjudgment interest, costs and attorney's fees; and

(9) Award Plaintiff Sudnick such other relief as the Court deems appropriate.

DATE:        6 October 2006                    Respectfully submitted,


            _____/s/ Timothy B. Mills
            DC Bar #425209
            Maggs & McDermott LLC
            910 17th Street N.W., Suite 800
            Washington, D.C. 20006
            Telephone:  (202) 457-8090

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 6th day of October 2006, I electronically transmitted the attached document:

### AMENDED COMPLAINT

to the Clerk of the Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants counsel for Defendant John A. Shaw and Defendant Department of Defense:

> PAUL C. RAUSER
> The Aegis Law Group
> 901 F Street, N.W., Suite 500
> Washington, DC 20004
> *Attorney for Defendant Shaw*

> JUDRY L. SUBAR (D.C. Bar No. 347518)
> U.S. Department of Justice, Civil Division
> Federal Programs Branch, Rm. 7342
> 20 Massachusetts Avenue, N.W.
> Washington, DC 20530
> *Attorneys for Defendant Dep't of Defense*

> /s/ Timothy B. Mills